IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICKI GARLAND, | No. CIV S-06-1105-CMK |
| Plaintiff, | |
| vs. | MEMORANDUM OPINION AND ORDER |
| MICHAEL J. ASTRUE,[1] Commissioner of Social Security, | |
| Defendant. | |
| _____/ | |

Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the consent of the parties, this case is before the undersigned for final decision on plaintiff's motion for summary judgment (Doc. 11) and defendant's cross-motion for summary judgment (Doc. 12).

/ / /

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Michael J. Astrue is substituted for his predecessor. The Clerk of the Court is directed to update the docket to reflect the above caption.

# I. BACKGROUND

Plaintiff applied for social security benefits on October 11, 2002. In her application, plaintiff claims that disability began on December 31, 1989. Plaintiff claims her disability consists of a combination of "pain fatigue, . . . limitations associated with . . . low back pain, migraine headaches, and immune deficiencies involving her kidneys, bladder, and sinuses." Plaintiff is a United States citizen born October 3, 1956, with a high school education.

## A. Summary of the Evidence

At the outset, the court observes that this case involves a closed period. Specifically, plaintiff claims her disability began on December 31, 1989, and it is undisputed that plaintiff only met the insured status requirements through March 31, 1990. Therefore, this case concerns the 3-month period between December 31, 1989, and March 31, 1990. Plaintiff would be entitled to benefits only if the record demonstrates that she first became disabled on or before March 31, 1990.

The following is a summary of the medical record in the three categories suggested by plaintiff: (1) back impairments; (2) migraine headaches; and (3) immune system problems.

### 1. Back Impairments

In September 1984, computed tomagrams of plaintiff's lumbar spine were obtained and analyzed by G.P. Martin, M.D. Dr. Martin noted annulus bulging at L4-5 and L5-S1. No free extruded fragments were noted and no definite neuroforaminal encroachment was seen. The lateral recesses were within normal limits. Dr. Martin recommended a myelogram for further evaluation. (CAR 388).

M. Adnan Sharkiah reported in August 1985 on the results of an electromyelogram. Dr. Sharkiah indicated that the study was performed for the following purposes: (1) to exclude cervical nerve root compression syndrome; (2) to exclude carpal tunnel

///

syndrome; and (3) to exclude the presence of thoracic outlet syndrome. The doctor concluded:

> Indeed, although there was a similar discopathic process at the level of L4-5 and the presence of spondylolytic process at L5-S1, the former discopathic process at L2-3 was thought to be of greater magnitude and thus of considerable implication in the initiation and precipitation of the patient's various neurologic symptomatology of low back pain and sciatic pain.

Dr. Sharkiah's impression following the electromyelogram was of moderate posterior central herniation of the L2-3 intervertebral disc, mild posterior bulging of the L4-5 intervertebral disc, and minimal spondylolisthesis at L5-S1. (CAR 137-47).

Dr. Sharkiah referred plaintiff for radiological imaging, which was performed in September 1985 by Jeremy McCreary, M.D. With respect to plaintiff's back, Dr. McCreary's impression was that plaintiff had mild to moderate right-sided defect at C6-7, probably representing joint spurring. He recommended clinical correlation. Dr. McCreary observed normal cervical and upper thoracic findings. (CAR 422-23).

Physical therapy records from November 1985 show 75% range of trunk motion in forward bending and left rotation, 80% range of trunk motion in left side bending, 90% range of trunk motion in right side bending, and 50% range of trunk motion in extension and right rotation. At that time, plaintiff reported improved functional tolerance and that exercise was helping. (CAR 418). Physical therapy records from May 1988 indicate that plaintiff's back pain had improved. Specifically, plaintiff reported decreased pain in her low back, decreased soreness and tightness in the thighs, and decreased numbness in the hips. (CAR 411-12).

An MRI was performed in June 1988 by James A. Pollock, M.D. Dr. Pollock's impression was that plaintiff had a large central disc protrusion at L3-4 and small central disc bulges at L2-3, L4-5, and L5-S1. (CAR 156).

/ / /

/ / /

/ / /

In August 1988, Gary A. Schneiderman, M.D., a specialist in spinal surgery, conducted an examination of plaintiff and offered the following impressions:

> In summary, Mrs. Garland has multi-level degenerative disease at 2-3, 3-4, 4-5, and 5-1. There is a Grade I spondylolisthesis which does not appear to be unstable at L5-S1. The source of her pain is undetermined. It could be coming from any level. Her lower extremity symptoms do not appear to be radicular based on her history and I found no evidence of any radicular neurological deficits on my exam today. Consequently, it is difficult to determine exactly the source level for her symptomatology. I would not recommend any further diagnostic evaluations from my point of view and would not recommend a fusion at this point. I have suggested to her that continuing with alternative exercise programs might be beneficial to her. She was resistant to going through any further rehabilitation program and consequently we do not feel that any further follow up would be required in our office. (CAR 405-06).

Another MRI was performed in March 1994 – after the expiration of plaintiff's disability insured status on March 31, 1990 – by Richard Gross, M.D. Dr. Gross indicated his findings in comparison to the 1988 MRI and diagnosed: (1) interim resolution of moderate-sized herniation at L3-4, with only mild abnormality at this level; (2) interim worsening of central disc herniation at L2-3; and (3) continued mild disc protrusions at L4-5 and L5-S1, which were not felt to be clinically significant. (CAR 164-65). A 2004 MRI revealed lumbar spondylosis with relatively advanced disc degeneration at L3-4, and moderate disc bulging and bone spurring. (CAR 454).

The medical records contain no statements from any medical provider as to how plaintiff's back problems affected her ability to perform work-related activities prior to March 31, 1990, and plaintiff does not point to any such records.

### 2. Migraine Headaches

Plaintiff was examined in May 1984 by R.N. Sauer, M.D. At that time, plaintiff complained of headaches which had persisted for the prior two months, as well as memory difficulty. Plaintiff told the doctor that the headaches were relieved with aspirin. A neurologic exam was normal. Dr. Sauer reported a normal electroencephalogram study. (CAR 389-91).

///

In January 1985, James A. Yarrow, M.D., conducted a neurological consultation in response to plaintiff's complaints of headaches. Plaintiff was alert and oriented with normal memory and speech. Plaintiff reported to Dr. Yarrow that her headaches were not relieved by Tylenol, but that they abated when she drank Pepsi with caffeine. Dr. Yarrow stated that he could find no signs of neurological dysfunction and did not recommend any follow-up. (CAR 437-40).

Dr. Sauer conducted another electroencephalogram in August 1987 which was also normal. (CAR 364).

In September 1987, Jonathan Breslau, M.D., reported on an MRI of plaintiff's brain. Dr. Breslau reported that the MRI results were normal, but observed findings seen in migraine sufferers. He did not entirely rule out demyelinative disease. (CAR 161).

The record contains medical reports from Neal L. Baumbach, M.D., from February 1996 through June 2001 – dates after expiration of plaintiff's insured status on March 31, 1990. In February 1996, Dr. Baumbach reported normal nerve conduction studies. In October 1997, he diagnosed right trigeminal neuralgia versus complicated migraine neuralgia overlap and recommended conservative treatment and no additional testing. In November 1997, Dr. Baumbach reported normal somatosensory responses and normal brainstem auditory responses. In December 1997, he diagnosed migraines and recommended medication. He also reported normal visual evoked responses at that time. In January 1998, Dr. Baumbach indicated that the cause of plaintiff's neurologic symptoms continued to be unknown. While he thought they might be related to migraines, Dr. Baumbach stated that plaintiff had other symptoms not necessarily associated with migraines. The doctor indicated that her responses were not consistent with demyelinating disease. In November 1999, Dr. Baumbach reported that plaintiff's headaches were under fairly good control with medication. No new medication was prescribed at this time. On March 9, 2000, Dr. Baumbach reported that plaintiff's MRI was abnormal. However, on March 15, 2000, he stated that plaintiff's brain MRI was unremarkable.

1 In June 2000, the doctor reported that plaintiff's migraine headaches were manageable with
2 intermittent doses of medication and did not recommend prophylactic medication. (CAR 179-
3 200).
4       As with plaintiff's back pain, the medical records contain no statements from any
5 medical provider as to how plaintiff's headaches affected her ability to perform work-related
6 activities prior to March 31, 1990, and plaintiff does not point to any such records.
7       3.    <u>Immune System Problems</u>[2]
8       Plaintiff was treated by Gary A. Gramm, D.O., for urinary problems beginning in
9 1983. In June 1983, Dr. Gramm reported that plaintiff complained of urinary frequency and that
10 she had a history of urinary tract infection. The doctor noted a positive urine culture at this time.
11 (CAR 397-99).
12       Dr. Gramm referred plaintiff to Philip Martin, M.D., for a thyroid scan, which was
13 performed in October 1986. While Dr. Martin noted that plaintiff's thyroid was enlarged, he did
14 not note any indications of active hyperthyroidism. (CAR 378).
15       A renal echogram performed in June 1987 showed a small right kidney calculus
16 and a normal left kidney. (CAR 369-70).
17       Plaintiff was treated by John R. Macri, M.D., for sinus problems. In November
18 1989, Dr. Macri performed a surgical procedure to treat chronic sinusitis. (CAR 447). The
19 doctor recommended that plaintiff would be unable to work for a two-month period from
20 October through December 1989 as a result.
21       In December 1990 – after expiration of plaintiff's disability insured status in
22 March 1990 – J.C. Chen, M.D., performed a CT scan of plaintiff's abdomen and observed
23 multiple small calculi in both kidneys. (CAR 442).
24 / / /

---

[2] According to plaintiff, these include kidney problems, urinary tract problems, and sinusitis.

Dr. Gramm referred plaintiff to Fred Herman, M.D., in 1994.  Dr. Herman noted that plaintiff reported a significant history of recurrent bladder infections and a family history of chronic sinus disease.  The doctor reported that past evaluations looking for systemic disease were unrevealing.  Dr. Herman recommended B-12 injections to control chronic fatigue syndrome.  (CAR 482-83).  In September 1994, Dr. Herman reported as follows:

> . . . [Plaintiff] was recently diagnosed with severe sinusitis and pneumonia. She suffers from IgG subclass deficiency which makes her increasingly susceptible to infections.  She had failed oral antibiotics and continued to worsen with sinus pressure, fatigue, headaches, and fever.  Because of this she was started on Rocephin with resolution of her infection.  (CAR 151).

In January 1995, Dr. Herman reported that plaintiff continued to require antibiotics for urinary tract infections and sinusitis.  He again reported low IgG subclass.  (CAR 163).

In September 1999, Dr. Gramm wrote a letter to plaintiff's insurance company documenting chronic urinary tract infections with frequent reoccurrence and recommended daily injections of Rocephin.  (CAR 162).

In June 2000, Edward J. Goetzl, M.D., recommended to plaintiff's insurance company that plaintiff be put on monthly intravenous gammaglobulin infusion therapy to respond to a definite immunodeficiency.  (CAR 168-69).  In October 2000, Dr. Goetzl stated that plaintiff had been diagnosed with immunoglobulin deficiency disorder with inadequate antibody response.  He indicated that this condition is chronic and incurable, characterized by a long series of infections which do not respond to antibiotics.  Dr. Goetzl stated that plaintiff has no protective antibody responses  He indicated that, when patients like plaintiff are acutely ill or suffering from acute infection, they may miss work during the acute phase of the illness.  (CAR 170).

In September 2002, plaintiff was examined by Sakti Das, M.D.  Dr. Das reviewed plaintiff's records and commented that they showed that plaintiff's right kidney was smaller than the left kidney.  He also indicated that plaintiff had 17% relative function in the right kidney and 83% function in the left kidney.  (CAR 206-07).

In March 2003, James R. McMonagle, M.D., of Sutter Roseville Medical Center prepared a consultation report following a referral from Dr. Martin for evaluation of possible adrenal insufficiency. At that time, Dr. McMonagle concluded that more testing was required to be certain of a diagnosis. (CAR 226-30). On March 27, 2003, plaintiff was admitted to Sutter for treatment of common variable immunodeficiency ("CVID").

In September 2003, Dr. Martin indicated that plaintiff suffers from hypogammaglobulinemia ". . . now as a result of her common variable immunodeficiency." (CAR 288). In February 2004, Dr. Martin reported that, according to plaintiff, she was not receiving the same benefit from gammaglobulin treatment as previously. (CAR 456).

Except for Dr. Gramm's indication that plaintiff could not work between October and December 1989 because of surgery performed in November that year, the medical records contain no statements from any medical provider as to how plaintiff's immune system problems affected her ability to perform work-related activities prior to March 31, 1990, and plaintiff does not point to any such records.

### B. Procedural History

Plaintiff's claim was initially denied. Following denial of her request for reconsideration, plaintiff requested an administrative hearing, which was held on February 19, 2004, before Administrative Law Judge ("ALJ") Mark C. Ramsey.

In his May 17, 2004, decision, the ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Act on December 31, 1989, the date the claimant stated she became unable to work, and continued to meet them only through March 31, 1990;

2. The claimant has not engaged in substantial gainful activity since December 31, 1989;

3. The medical evidence establishes that the claimant had back pain due to multi-level degenerative disease and Grade I spondylosthesis; and neck pain related to mild to moderate right-sided epidural defect at C6-7; however, she did not have an impairment or combination of impairments, either singly or in combination, listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4;

| | | |
|---|---|---|
| 4. | | The claimant's allegations of disability and subjective complaints are not found to be fully credible for the reasons set forth in this decision, and are not supported by medical evidence contained in the record; |
| 5. | | During the pertinent period, the claimant had the residual functional capacity to perform work-related activities except for work involving lifting of more than 10 pounds frequently, and 20 pounds occasionally; |
| 6. | | The claimant's past relevant work as an account clerk and bookkeeper did not require the performance of work-related activities precluded by the above limitation; |
| 7. | | The claimant's impairments did not prevent the claimant from performing her past relevant work, as she performed it; and |
| 8. | | The claimant was not under a disability as defined in the Social Security Act prior to the expiration of her insured status on March 31, 1990. |

Based on these findings, the ALJ concluded that plaintiff was not disabled and, therefore, not entitled to benefits. After the Appeals Council declined review on January 11, 2006, this appeal followed.

## II. STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971). The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence. See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the

Commissioner is conclusive. See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987). Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

### III.  DISCUSSION

In her motion for summary judgment, plaintiff argues that the ALJ erred in five ways. Specifically, plaintiff argues: (1) the ALJ failed to consider a combination of all of plaintiff's impairments, findings as "severe" only her back and neck pain; (2) the ALJ failed to consider all her limitations in determining her residual functional capacity; (3) the ALJ failed to discharge his duty to develop the record; (4) the ALJ erred in concluding that plaintiff could perform her past relevant work; and (5) the ALJ improperly rejected her testimony as not credible.

**A.    The ALJ's Severity Determination**

In order to be entitled to benefits, the plaintiff must have an impairment severe enough to significantly limit the physical or mental ability to do basic work activities. See 20 C.F.R. §§ 404.1520(c), 416.920(c).[3] In determining whether a claimant's alleged impairment is sufficiently severe to limit the ability to work, the Commissioner must consider the combined effect of all impairments on the ability to function, without regard to whether each impairment alone would be sufficiently severe. See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir.

---

[3]   Basic work activities include: (1) walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. See 20 C.F.R. §§ 404.1521, 416.921.

1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923. An impairment, or combination of impairments, can only be found to be non-severe if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work. See Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988) (adopting SSR 85-28). The plaintiff has the burden of establishing the severity of the impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings. See 20 C.F.R. §§ 404.1508, 416.908. The plaintiff's own statement of symptoms alone is insufficient. See id.

Plaintiff claims that the ALJ erred at step two of the sequential evaluation in concluding that plaintiff's only severe impairments prior to March 31, 1990, were back and neck pain. She argues that the evidence makes ". . . clear that [her] chronic battle with immune deficiency problems such as sinusitis, kidney pain, urinary tract infections, and headaches existed prior to March 31, 1990 . . ." and that these impairments were severe. Plaintiff asserts that the ALJ ignored these impairments in his severity finding. As to headaches, plaintiff points to the records from Dr. Sauer from May 1984 and August 1987. Regarding sinusitis, plaintiff refers to records from Dr. Macri from November 1989. Plaintiff references records from Dr. Gramm from June 1987 to support her contention regarding kidney problems.

       1.    Immune System Problems

As to the effect of plaintiff's immune system problems on her ability to work, the ALJ stated:

> The record prior to March 30, 1990, shows that the claimant was treated for urinary tract infections; however, Doctor Bowen noted in December 1988 that cultures were negative, and the only findings on systourethroscopy that could suggest a problem in the lower urinary tract was some submucosal hemorrhages. However, she did not have severe frequency, urgency, or nocturia. Despite the claimant's allegations of problems with kidney disease, there is no objective evidence to support her contentions prior to March 1990. A renal echogram in June 1987 revealed no evidence of renal mass. There was a small right renal calculus producing shadowing, and a normal left kidney. The record shows that the claimant was successfully treated with lithotripsy treatment for kidney

> stones, and there is no evidence that kidney problems presented any functional limitations prior to March 30, 1990.
>
> Although Doctor Gramm opined that the claimant was unable to perform her regular work for a two-month period, October 16, 1989, to December 1, 1989, due to a recent procedure for sinusitis and polyps, there is nothing in the record to suggest that her symptoms lasted for twelve months or that they imposed any restrictions on the claimant's ability to perform a full range of light work. The undersigned concludes that claimant's records do not document evidence that these impairments were severe, either singly or in combination, or document that the combination of the claimant's symptoms and complaints are equivalent to a severe impairment prior to March 31, 1990.
>
> The undersigned notes that after the expiration of the claimant's insured status, the claimant was evaluated by an endocrinologist and a urologist for recurrent urinary tract infections. The record shows that the claimant was subsequently found to have a multi immunoglobulin deficiency disorder with inadequate antibody response, and began treatment in the year 2000 to keep her immune system function and to minimize the frequency and intensity of possible infections. Although Doctors Gramm and Martin noted multiple chronic medical conditions in their summary statements in September 2003, well after the expiration of her insured status, their conclusions . . . cannot be related to the period when the claimant was insured. Through the pertinent period, the record shows that the claimant was capable of performing light work, and there are no objective findings to support a finding of disability prior to March 30, 1990.

The court finds this analysis to be amply supported by the medical record. Accepting plaintiff's statement that she battled chronic immune system problems prior to March 31, 1990, the record clearly demonstrates that no doctor opined that these problems adversely affected her ability to work. While plaintiff's immune system problems appear to have become worse after March 31, 1990, and may have precluded the full range of light work as plaintiff contends, this case involves a closed period of disability ending before plaintiff's problems worsened.

Contrary to plaintiff's contention, the ALJ did not ignore plaintiff's immune system problems in his severity analysis. Rather, he discussed them in detail and correctly concluded that they did not affect her ability to perform the full range of light work prior to the end of the closed period.

///

2.  <u>Headaches</u>

Similarly, as to plaintiff's allegation of disabling headaches, the record does not support that headaches limited her ability to work prior to March 31, 1990. In fact, the evidence demonstrates that plaintiff's headaches were intermittent and controlled by medication and conservative treatment.

**B.     The ALJ's Residual Functional Capacity Determination**

Residual functional capacity is what a person "can still do despite [the individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); <u>see</u> <u>also</u> <u>Valencia v. Heckler</u>, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current "physical and mental capabilities"). As to plaintiff's residual functional capacity, the ALJ stated:

> . . . The undersigned concludes that the claimant retained the residual functional capacity to perform a full range of light work, including her past work as an account clerk and bookkeeper, prior to March 31, 1990, despite her impairments. Light work includes the ability to stand, walk, and sit for at least six hours in an eight-hour period with regular break opportunities, and to lift 20 pounds occasionally and ten pounds frequently.
>
> In support of this finding, the undersigned notes the lack of ongoing significant, objective clinical findings which would warrant a finding of disability prior to the expiration of the claimant's insured status on March 31, 1990. Medical records prior to that time reveal that the claimant's migraine headaches were controlled with medication. MRI scans of the brain and neurological evaluations were within normal limits.
>
> The undersigned finds that a limitation to light exertion prior to March 31, 1990, is reasonable, given the claimant's treatment for back and neck pain prior to that time, x-ray findings, and MRI findings in June 1988, which demonstrated a large central disc protrusion at L3-4, and small central bulges of the discs at L2-3, 4-5 and L5-S1. Despite the claimant's allegations of chronic back and neck pain, the medical records show no indication of muscle wasting, deformity, gross muscle atrophy, or neurological deficits. Medical records show findings of tenderness and decreased range of motion of the lumbar and cervical spine. However, the claimant was treated conservatively for her pain symptoms, and surgery was not suggested. It was the claimant's testimony that her medications included anti-inflammatory medications and muscle relaxants, which are not indicative of chronic pain symptoms; and physical therapy and osteopathic manipulation therapy.

///

Plaintiff argues that the ALJ erred in concluding that, prior to March 31, 1990, plaintiff retained the residual functional capacity to perform all work-related activities except work involving lifting more than 10 pounds frequently and 20 pounds occasionally. Specifically, plaintiff asserts that the ALJ ignored the opinion of Dr. Sharkiah with respect to "limitations commonly associated with back and neck problems, such as standing, walking, sitting, and postural limitations such as bending, stooping, crouching, and crawling." She also contends that the ALJ ignored limitations that would be caused by her immune deficiency problems and headaches "such as environmental restrictions and attention/concentration impairments."

    1. <u>Standing, Walking, Sitting, and Postural Limitations</u>

As to Dr. Sharkiah, whom plaintiff asserts expressed limitations to standing, walking, sitting, and postural activities, the ALJ summarized the records as follows:

> Ms. Garland had complaints of headache, left arm pain, and low back pain when she was evaluated by M. Adnan Sharkiah, M.D. Neurological examination on August 21, 1985, revealed the claimant had no gait deficit. When she attempted to sit, she was observed to be rather careful in the manner of how to sit and how to support her back. The head appeared to be symmetrical, with no abnormality or deformity noted. The cranial nerves were examined by the appropriate test and proved functional. [¶] There was a normal range of motion of the neck. There was some tenderness by exerting local pressure in the left supraclavicular fossa. Examination of the heart and lungs was within normal limits. Motility function in the left upper extremity appeared to be unaffected. Power of movement and power of contraction, as well as extension and flexion, were evaluated individually in both upper extremities and at each joint separately in a classical manner. On the basis of such examination, no focal neurological deficit could be deduced or determined. Reflexes were physiological, active, and bilaterally equal.

The ALJ also noted Dr. Schneiderman's findings as follows:

> . . . An examining orthopedic surgeon, Gary Schneiderman, M.D., who evaluated the claimant in August 1988, reported that the claimant has multi-level degenerative disease and Grade I spondylolisthesis which does not appear to be unstable at L5-S1. Her lower extremity symptoms did not appear to be radicular, and no evidence of any radicular neurological deficits were found. No further diagnostic studies were recommended, and no surgery was recommended. She was advised to continue alternative exercise programs.

The court agrees with the ALJ that the record does not support any limitations which would preclude the full range of light work.  In particular, no doctor ever opined limitations to sitting, standing, walking, or postural activities.   While Dr. Sharkiah stated in 1985 that plaintiff's "pain has progressively deteriorated to the extent that the patient is unable to stand, to sit, to cough, or to engage in any normal or useful activity," this statement appears to be based solely on plaintiff's subjective complaints given the unremarkable objective clinical findings.

### 2. Environmental and Attention/Concentration Limitations

While plaintiff does not point to any specific records in support of her contention that she suffered from attention/concentration limitations, it appears that this assertion is based on plaintiff's headaches.  However, as discussed above, there is no evidence of disabling headaches prior to March 31, 1990.  Plaintiff's headaches were well-controlled with medication and no doctor opined any specific attention or concentration limitations.

### C. **The ALJ's Duty to Develop the Record**

The ALJ has an independent duty to fully and fairly develop the record and assure that the claimant's interests are considered.  See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).  When the claimant is not represented by counsel, this duty requires the ALJ to be especially diligent in seeking all relevant facts.  See id.  This requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."  Cox v. Califano, 587 F.2d 988, 991 (9th Cir. 1978).   Ambiguous evidence or the ALJ's own finding that the record is inadequate triggers this duty.  See id.  The ALJ may discharge the duty to develop the record by subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow for supplementation of the record.  See id. (citing Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998)).

///

Plaintiff – who was not represented by counsel at the administrative hearing – argues that the ALJ failed in his duty to develop the record in two respects: (1) the ALJ did not obtain evidence from a medical expert to determine the onset date of disability, as required by Social Security Ruling 83-20; and (2) the ALJ failed to recontact plaintiff's treating physician in determining the duration of her disability and her residual functional capacity prior to March 31, 1990, as required by Social Security Ruling 96-5p and 20 C.F.R. § 404.1519a.

### 1. Evidence Concerning Onset Date

Plaintiff argues that the ALJ erred in not obtaining evidence from a medical expert concerning the onset date of plaintiff's disability. According to plaintiff, when the onset date must be inferred because the record is unclear on the issue, the ALJ is required to obtain medical expert opinion as to the actual onset date.

While plaintiff is correct in her statement of law, see Armstrong v. Commissioner, 160 F.3d 587 (9th Cir. 1998), she is incorrect in her assertion that the record in this case was unclear. In Armstrong, the Ninth Circuit noted: "Exactly when Armstrong's various impairments became disabling is unclear." Id. at 590. Specifically, the record was not clear as to whether the plaintiff became disabled before or after a closed period of disability had ended. See id. In this case, there is no such uncertainty. The record demonstrates that plaintiff's impairments first became disabling (if at all) after March 31, 1990. Conversely, it is clear that plaintiff was not disabled prior to March 31, 1990. For this reason, the uncertainty which requires the ALJ to call an expert did not exist.

### 2. Recontacting Plaintiff's Treating Physicians

Plaintiff argues that, because Dr. Gramm opined that plaintiff was disabled, and because he was plaintiff's treating physician since 1983, the ALJ was required to recontact Dr. Gramm for clarification as to how long plaintiff had been disabled and what her functional capabilities were prior to March 31, 1990. The court does not agree. The ALJ is required to recontact a treating physician ". . . only if the doctor's report is ambiguous or insufficient for the

16

ALJ to make a disability determination." Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005) (citing 20 C.F.R. §§ 404.1512(e) and 416.912(e)).  In this case, Dr. Gramm's reports are not ambiguous or insufficient to determine disability.  In September 2003, Dr. Gramm stated: "Ms. Garland is chronically ill and unable to work in any full time capacity."  He recommended that plaintiff be considered totally and permanently disabled.  He did not, however, indicate that this disability existed at any time prior to March 31, 1990, and no doctor so opined.  In other words, accepting that plaintiff was disabled as of September 2003, the record is clear that she was not disabled prior to March 31, 1990.

### D. The ALJ's Finding Regarding Performance of Past Relevant Work

As to whether plaintiff's impairments precluded her past relevant work, the ALJ stated:

> In assessing whether Ms. Garland's residual functional capacity would permit the performance of her past relevant work, Social Security Ruling 82-62 directs the Administrative Law Judge to compare the claimant's residual functional capacity with the physical and mental demands of her past relevant occupations.  The undesigned finds that prior to March 31, 1990, the claimant remained capable of performing her past relevant work as an account clerk and bookkeeper.  Because the work was performed 15 years prior to the date she last met the earnings requirement under the law, and at levels indicative of substantial gainful activity, the undersigned concludes that this activity can be considered work experience.  In these positions, the claimant reported that she lifted less than 10 pounds.

As to the effect of plaintiff's pain symptoms and immune system problems, the ALJ concluded:

> Although it is clear from the record that Ms. Garland's symptoms and her immune system problems worsened after [March 31, 1990], the undersigned finds the claimant's impairments did not approach the level of severity to prevent her from performing her past relevant work prior to March  31, 1990.

Plaintiff's argument concerning these conclusions is, in its entirety, as follows:

> Ultimately . . . , since the ALJ improperly assessed plaintiff's RFC and the RFC findings is not supported by substantial evidence, the fourth step analysis [of determining whether plaintiff can perform her past relevant work] is necessarily inadequate, as the RFC must first be accurate before any proper fourth-step analysis can be made.

///

1  Thus, plaintiff's argument relies entirely on her argument above concerning her residual
2  functional capacity.  As discussed above, the court does not find any error with respect to the
3  ALJ's residual functional capacity assessment.  Therefore, plaintiff's derivative argument
4  concerning her ability to perform her past relevant work is unpersuasive.  Because the ALJ
5  correctly concluded that plaintiff had the residual functional capacity before March 31, 1990, to
6  perform the full range of light work, he also correctly concluded that plaintiff could perform her
7  past relevant work as an account clerk and bookkeeper.

### E.     The ALJ's Credibility Determination

The ALJ summarized plaintiff's hearing testimony as follows:

> At the hearing, the claimant testified that she was unable to engage in
> work activity prior to the date she last met the earnings requirement under
> the law on March 30, 1990, due to back pain, . . . . bulging discs and spurs,
> neck pain, and headaches.  She could not bend or lift more [than] five
> pounds.  She could not stand more than 20 minutes at a time due to back
> pain and right leg extremity pain.  She was limited to sitting 15 minutes at
> a time.  Her treatment included the use of Motrin and muscle relaxers,
> physical therapy and osteopathic manipulation therapy.  Ms. Garland also
> testified that she was . . . unable to engage in work activity due to kidney
> pain, [constant] migraine headaches, and burning with urination.  She
> testified that she has common variable immune deficiency [CVID], which
> was diagnosed in 1994.  Her body cannot fight viruses and bacteria, which
> results in being sick all the time.  She has right kidney pain, kidney stones,
> and her kidney has been shrinking over the years.  Her sinuses are
> inflamed, and she is constantly on antibiotics.  Her immune system is so
> low that she now receives infusions of gamma globulin every three weeks.
>
> Prior to March 31, 1990, Ms. Garland testified that her daily activities
> included performing household chores such as laundry, occasionally
> mopping floors, and meal preparation.  She drove her five year old
> daughter to and from school.  Her husband worked out of town during the
> week and was only home on weekends, so she shopped for groceries on
> the weekends with her husband.  She did sewing as a hobby.

As to plaintiff's credibility, the ALJ stated:

> Evaluating the claimant's subjective complaints pursuant to the guidelines
> of Social Security Ruling 96-7p and 20 C.F.R. 404.1529, the undersigned
> concludes that the claimant was not limited by incapacitating pain or
> functional limitations from performing a full range of light work.
> Moreover, the claimant's daily activities during the pertinent period are
> indicative of a capability to perform her past work.  In this regard, the
> claimant testified that her daily activities included performing household

> chores such as laundry, mopping floors occasionally, and meal preparation. She drove her daughter to and from school, and did some sewing. In addition, she testified that her husband worked out of town during the week and was home only on the weekends. Therefore, it appears that the claimant had the responsibility of caring for her daughter, who was five years of age, which requires considerable mental and physical effort on a sustained basis. These activities do not support the degree of pain, limitation, or fatigue alleged by the claimant.
>
> The undersigned finds that the testimony provided by the claimant at the hearing to be for the most part credible and consistent with the medical evidence contained in the record. However, to the extent the claimant's testimony suggests that she was incapable of all work activity due to her combined impairments prior to March 31, 1990, the undersigned finds such testimony not to be supported by the medical evidence contained in the record. Therefore, it appears that the claimant did not have a medically determinable impairment on or before March 31, 1990, which would have prevented her from performing her past work.

Plaintiff argues that the only reason the ALJ gave for rejecting her testimony was the ". . . general statement that her testimony was not supported by the medical evidence." According to plaintiff, this reason is not "specific, clear, and convincing" and ". . . is simply wrong, as the medical records . . . clearly support plaintiff's testimony." Initially, the court observes that, while the ALJ did conclude that plaintiff's testimony was not supported by the medical evidence, the ALJ also concluded that plaintiff's testimony of disabling pain and/or fatigue was not consistent with her daily activities. Thus, the court rejects plaintiff's argument that the ALJ only cited inconsistency with the medical record as the basis for rejecting her testimony. Both of the reasons cited by the ALJ are specific and legitimate. The question, then, is whether these reasons are supported by substantial evidence in the record as a whole.

        1.    <u>Consistency with Daily Activities</u>

Concerning plaintiff's daily activities up to March 31, 1990, plaintiff testified that she did most of the laundry, occasionally mopped the floors, and cooked about one meal per day. She also stated that she might have gone camping. Plaintiff testified that she sewed as a hobby and went to one or two movies per year. She also stated that she drove a car. The court agrees with the ALJ that these activities are inconsistent with plaintiff's claim that she could not

perform any work prior to March 31, 1990.

### 2. Consistency with Medical Evidence

As discussed in detail above, the record amply shows that plaintiff was not disabled prior to March 31, 1990. Therefore, the court also agrees with the ALJ's assessment that plaintiff's testimony that she could not do any work prior to that time is not consistent with the medical evidence. While the record establishes that plaintiff did in fact have impairments prior to March 31, 1990 – specifically back and neck pain – there is no evidence that these problems were disabling.

## IV. CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis. Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment is denied;
2. Defendant's cross-motion for summary judgment is granted; and
3. The Clerk of the Court is directed to enter judgment and close this file.

DATED: August 24, 2007.

                                              **CRAIG M. KELLISON**
                                              UNITED STATES MAGISTRATE JUDGE